## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| ANDREA WOODS YEARBY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:04-CV-01401-JHH |
| | ) | |
| THE CITY OF BIRMINGHAM, | ) | |
| ALABAMA, a municipal corporation; | ) | |
| et al. | ) | |
| Defendants | ) | |
| | ) | |

## MEMORANDUM OF DECISION and ORDER

## Procedural Background

On June 1, 2004, Andrea Woods Yearby ("Plaintiff") filed suit in the Circuit Court of Jefferson County against the City of Birmingham ("the City"), Chief of Police Annetta Nunn ("Chief Nunn"), Mayor Bernard Kincaid, Officer Clarence Harris ("Officer Harris") and Officer Ira Johnson ("Officer Johnson"), alleging, among other things, violation of her Constitutional rights arising out of the actions of Officer Harris on February 27, 2004.  Pursuant to 28 U.S.C. § 1441(a), on July 1, 2004, Defendants removed the action to this Court based upon federal subject matter jurisdiction stemming from Plaintiff's federal claims under the United States Constitution and 28 U.S.C. § 1983 in Counts IV, V and VII.[1]  By the March

---

[1] Plaintiff's state law claims in Counts I, II, III and VI are before this Court by virtue of its supplemental jurisdiction.  28 U.S.C. § 1367.

18, 2005 order Mayor Bernard Kincaid was dismissed as a party to this lawsuit.
Because Officer Harris never made an appearance and because Plaintiff's repeated
efforts to achieve service failed, this Court by its June 13, 2005 order also
dismissed Officer Harris as a Defendant.  In her brief in opposition to summary
judgment, discussed *infra*, Plaintiff concedes that Officer Johnson and Chief Nunn
in their individual capacities are due to be, and hereby are DISMISSED.  The
remaining counts against Officer Johnson and Chief Nunn are maintained only in
their official capacities and are therefore claims against the City.[2]  Thus, all the
remaining counts against Officer Johnson and Chief Nunn in their official
capacities also are DISMISSED.

　　　Now remaining before the Court are the following claims:  Count I - state
law claim for assault; Count II - state law claim for false imprisonment; Count III -
state law claim of outrage; Count IV - claims for use of excessive force,
unreasonable search and seizure, deprivation of due process brought pursuant to §
1983; Count V - claim for false imprisonment which violated Plaintiff's rights

_____

　　　[2]  As the Supreme Court has explained, "[o]fficial capacity suits . . . 'generally represent
only another way of pleading an action against an entity of which an officer is an agent.' . . . It is
*not* a suit against the official personally, for the real party in interest is the entity.  Thus, while an
award for damages against an official in his personal capacity can be executed only against the
official's personal assets, a plaintiff seeking to recover a damages judgment against an official-
capacity suit must look to the government entity itself." <u>Kentucky v. Graham</u>, 473 U.S. 159,
165-166 (1985) (internal citations omitted); <u>see also</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991).

under the Fourth and Fourteenth Amendments to the U.S. Constitution which claims also are brought pursuant to § 1983;[3] Count VI - claim for violation of rights under the Alabama Constitution; and Count VII - claim for failure to train and failure to supervise, brought pursuant to § 1983.  On April 29, 2005, the City (along with Chief Nunn and Officer Johnson who have been dismissed herein) filed a motion for summary judgment as to all claims.  Plaintiff filed her opposition to the City's motion, with accompanying evidence on May 2, 2005, and the City filed a reply on June 2, 2005.[4]  Having reviewed the briefs and evidence

---

[3]  Count IV states a claim for use of excessive force and unreasonable search and seizure. Count IV also alleges a denial of Plaintiff's right to due process.  Count V alleges that the same illegal search and seizure violated Plaintiff's rights under the Fourth and Fourteenth Amendments.  The right of Plaintiff to be free from an unreasonable search and seizure by state officials arises through the Fourteenth Amendment but is analyzed under the Fourth Amendment. See Graham v. Connor, 490 U.S. 386, 395 (1989) (Supreme Court held that "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment . . ."); see also U.S. v. Lanier, 520 U.S. 259, 261, 272 n. 7 (1997) (judge was convicted of violating the Constitutional rights of five women when he sexually assaulted them).  Plaintiff's claim of excessive force arises out of the Due Process Clause of the Fourteenth Amendment.  See Vineyard v. County of Murray Georgia, 990 F.2d 1207, 1211 (11th Cir. 1993).  Because Count V merely states the portion of the Constitution from which the claims in Count IV originate, they are redundant and are treated as if they state one claim for violations of Plaintiff's Constitutional rights under each theory.  Counts IV and V also allege violations of Plaintiff's rights under the Alabama Constitution, but as will become apparent, the Court need not address these purely state law claims.

[4]  In conjunction with their June 2, 2005 reply, the City also filed a motion to strike Plaintiff's exhibit list and witness list and a motion to strike Plaintiff's exhibits #1, #2, #3, #4, #7, #8 and #9 in support of summary judgment.  For reasons made apparent by the disposition of this order, the City's motion as to Plaintiff's exhibit and witness list is moot.  As regards its motion to strike Plaintiff's exhibits in support of summary judgment, even considering all the evidence Plaintiff offered, the City's motion to for summary judgment is still due to be granted as

3

submitted by the parties, for reasons discussed herein, the City's motion for summary judgment in its favor is due to be GRANTED as to all federal claims (Counts IV, V and VII), and Plaintiff's remaining state law claims will be remanded to the Circuit Court of Jefferson County for further proceedings.

## Undisputed Factual Background[5]

Between 9:30 and 10:00 p.m. on February 27, 2004, Plaintiff called the Birmingham Police department due to a domestic disturbance between herself and her husband, Richard Dudley ("Dudley").[6] Officers Harris and Johnson responded to the call, and when they arrived Plaintiff and Dudley were standing outside of the house. The officers asked Plaintiff and Dudley what the problem was and asked them both for identification. Plaintiff produced identification. Officer Harris told Plaintiff to go into the house and said that he would be in to talk with her in a minute. Dudley told the Officers that he needed a ride to Titusville and got in the police car.[7] Officer Johnson remained outside with Dudley, and Officer

---

outlined herein. Accordingly, there is no need for the Court to rule on this motion, and it is also considered moot.

[5] Where there is a factual dispute, unless otherwise noted, the facts are stated in the light most favorable to the non-movant.

[6] Before the police arrived, Plaintiff and Dudley apparently resolved their dispute. Plaintiff alleges that she unsuccessfully attempted to cancel her call to the Birmingham Police Department. Regardless, this fact is immaterial to the resolution of the claims herein.

[7] Titusville is on the Southside of Birmingham, Alabama.

Harris entered the residence.

Once inside the house, Officer Harris entered the bedroom where Plaintiff was sitting on the side of her bed.  Officer Harris questioned Plaintiff regarding the reported domestic disturbance and informed Plaintiff that there were outstanding warrants for her arrest.[8]  Officer Harris told Plaintiff that he could arrest her and then asked "what are we going to do about these warrants?"  Plaintiff acknowledged that she had some traffic violations, but did not know about any warrants out for her arrest.  Reiterating that there were warrants out for Plaintiff's arrest, Officer Harris indicated that he could take her to jail.

At this point, Officer Harris reached down and put his hand under Plaintiff's tee shirt and grabbed her breast.  Officer Harris then told Plaintiff "you can have sex with me or I can arrest you and take you to jail."  Officer Harris then unzipped his pants, exposed his penis to Plaintiff, and began rubbing himself in front of Plaintiff.  Officer Harris said to Plaintiff "wouldn't you like something big," and asked if she had a condom.  Plaintiff responded by telling Officer Harris that she had very nosy next door neighbors and suggested to Officer Harris that because he

---

[8]  Plaintiff's record indicates that she had several moving vehicle violations on her record. (Def. Ex. 6).  Whether these violations included outstanding warrants for Plaintiff's arrest is not clear.  Nor is it clear that the traffic violations with which Plaintiff was charged were offenses sufficient to justify her arrest.

was in uniform, his behavior would jeopardize his job.  Attempting to get rid of Officer Harris, Plaintiff told him that he could come back later.  Officer Harris then left the bedroom, exited the house, and got in the car with Officer Johnson. Immediately after Officer Harris left the bedroom, Plaintiff called the Birmingham Police Department and reported the incident to a supervisor.

With Officer Harris driving, the two officers took Dudley to Titusville as they had agreed.  After dropping Dudley off, Officer Harris received a call and learned that Plaintiff had called and complained about the incident.  After Officer Harris made a call on his cell phone, he told Officer Johnson that they were returning to Plaintiff's residence and that he should have arrested Plaintiff when they were at her house earlier.  The officers arrived at Plaintiff's residence and entered the premises.  Officer Harris asked Plaintiff why she had reported him and told her she was going to go to jail.  Plaintiff contested that she had warrants and picked up the phone saying she wanted to call her son if she was going to jail. Officer Harris then jerked the phone out of Plaintiff's hand and hung it up.  Officer Harris then told Plaintiff to turn around and said "don't make me use force." Officer Harris then lifted Plaintiff off the bed.  At that point the phone rang and Officer Harris answered it.  Officer Harris's supervisor was on the other end of the line, and Plaintiff yelled "I'm glad you called back, he is back and he is going to

arrest me." Officer Harris told Plaintiff that his supervisor was coming to the residence and backed off.[9] Approximately ten minutes later, Officer Thomas, Officer Harris's supervisor, arrived at Plaintiff's residence and told the officers to leave. After an investigation of Officer Harris, the Internal Affairs Department confirmed Plaintiff's allegations and Officer Harris resigned. (Pl. Ex. 2).

## Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion,

---

[9] The parties disagree as to the exact details of the events surrounding the officers' reentry into Plaintiff's residence. According to Officer Johnson, when they entered the residence Plaintiff was already on the phone, and Officer Harris instructed her to hang it up. Officer Harris then told Plaintiff she was going to jail. Plaintiff contested having any warrants out for her arrest, asked to call Officer Harris's supervisor and her brother. Officer Johnson claims that Officer Harris called their supervisor and apparently had a conversation and hung up. The phone rang again and Officer Johnson answered it and handed it to Plaintiff. Plaintiff then told the person on the other end of the line that Officer Harris was going to arrest her. Officer Harris then went back to the car. While Officer Harris was gone, Plaintiff said to Officer Johnson "you don't know what's going on do you?" Plaintiff then relayed the events of the night to Officer Johnson, who was apparently unaware of Officer Harris's earlier harassment of Plaintiff.

and identifying those portions of the pleadings or filings, which it believes

demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at

323.  Once the moving party has met its burden, Rule 56(e) requires the non-

moving party to go beyond the pleadings and by its own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific

facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material and which are

irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  All reasonable doubts about the facts and all justifiable

inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023;

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for

the non-moving party." Anderson, 477 U.S. at 248;  Chapman, 229 F.3d at 1023.

If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge

its initial burden depends on whether that party bears the burden of proof on the

issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing U.S. v. Four Parcels of

Real Property, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party

bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply

requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## Substantive Law and Analysis[10]

Counts IV, V and VII of the complaint allege that the City is liable to Plaintiff for its violations of her Constitutional rights arising out of the conduct of Officer Harris.  A municipality is liable for the Constitutional violations of its employees when the conduct in question "was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of *respondeat superior*." Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1479 (11th Cir. 1991); see also Monell v.

---

[10]  Counts IV, V and VII allege the claims upon which this Court's jurisdiction rests, and accordingly they are addressed first.

10

Dept. of Social Service, 436 U.S. 658, 690 (1978) (municipalities are properly liable for unconstitutional action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). To establish municipal liability, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation," City of Canton v. Harris, 489 U.S. 378, 386 (1989).[11] Proving causation is a key aspect of a successful § 1983 claim, and requires evidence that a municipal policy was both "deliberate" and that it was the "'moving force' behind the injury alleged." Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997).

The Supreme Court has recognized several different theories under which a plaintiff may succeed on § 1983 claims. See e.g., id. at 403-04. Plaintiff here concedes that the City did not have a formal policy which encouraged Officer Harris's actions. Rather, Plaintiff argues that City caused the violation of her

---

[11]  These principles notwithstanding, "a 'municipal act' is not . . . limited to decisions made by the city's official legislative body or in written agreements." Ft. Lauderdale, 923 F.2d at 1480. Rather, an official policy or custom may be established by the decisions of "other officials 'whose acts or edicts may fairly be said to represent official policy.'" Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) (citations omitted). Thus, "a municipal official who has 'final policymaking authority' in a certain area of the city's business may by his or her action subject the government to § 1983 liability when the challenged action falls within that authority." Ft. Lauderdale, 923 F.2d at 1480. Whether a particular state actor exercises the requisite degree of "policymaking authority is a question of state law." Id. In the instant case, Defendants concede that Chief Nunn is an official policy maker.

Constitutional rights because (1) it's actions amounted to a "custom" and (2) that the City failed to adequately train or supervise Officer Harris.  The following analysis will address these two theories separately.

## I.    *Governmental Custom*

Where no official policy exists, a plaintiff may still succeed on a § 1983 claim if she is able to "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001); see also Depew v. City of St. Mary's, 787 F.2d 1496, 1499 (11th Cir. 1986) ("To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice.").  To succeed with such a claim, "actual or constructive knowledge of such customs must be attributed to the governing body of the municipality." St. Mary's, 787 F.2d at 1499.  Even so, "the custom need not receive formal approval," but as a general rule, "random acts or isolated incidents are insufficient to establish a custom or policy." Id.[12]

Plaintiff argues that the City's failure to properly deal with past sexual

---

[12]  "In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Ft. Lauderdale, 923 F.2d at 1481.

misconduct by its officers amounts to a custom or policy that is directly

responsible for Officer Harris's assault on her.  See e.g., Brooks, 813 F.2d 1191,

1193 (11th Cir. 1987).  In support of her claim, Plaintiff offers a computer printout

from the City's Internal Affairs Division, which lists every complaint and its

disposition from November 1996 until April 2001.  (Pl. Ex. 4).[13]   According to

Plaintiff, during that time period there were seventeen instances of misconduct, of

which six were sustained.[14]  Of the six sustained instances, each officer was

punished for his actions.[15]

---

[13]  Notably, the incident involving Officer Harris and Plaintiff occurred in February of
2004, yet Plaintiff's evidence of complaints against officers for sexual misconduct spans only
from 1996 to 2001.  During this almost three year gap, Plaintiff offers no evidence of city policy,
no evidence of a complaint and no evidence of a procedures to deal with such complaint.

[14]  Plaintiff concedes that no action was taken with regard to over half of the complaints
because they were "unsupported, unfounded or suspended due to an inability to locate the
complaining party." (Pl. Opposition to Summary Judgment, p. 11, Doc. # 33).  Such
unsubstantiated complaints have no evidentiary value in this proceeding.  See Brooks, 813 F.2d
at 1194 ("It would be perverse to require that courts exclude allegations of past wrongdoing in
order to protect the rights of defendants, while at the same time demanding that police officers
give credence to unsubstantiated complaints against individual police officers.").  Further, there
is no evidence of the size of the City's police force between 1996 and 2001.

[15]  Although Plaintiff presents the computer printout listing the complaints, Plaintiff does
not sufficiently explain the printout.  A close review reveals five sustained complaints that were
overtly sexual in nature, including Officer Harris's illegal strip search.  Officer Phillip Ray had
sex with an inmate and was fired.  (Pl. Ex. 4 at 3).  Officer Larry Fitzpatrick received a letter of
censure for grabbing a woman and using profanity and was suspended for one day for violating
the sexual harassment policy by displaying an inappropriate picture.  (Pl. Ex. 4 at 8).  Officer
Robert Nelson sexually harassed a woman and was suspended for three days.  (Pl. Ex. 4 at 9).
The sixth sustained complaint referenced by Plaintiff states that Officer Anthony Smith was
suspended for fifteen days for breaking into a woman's house and assaulting her.  (Pl. Ex. 4 at
11).  The record gives no indication that the assault was sexual in nature; however, in this
instance the Court will draw an inference in favor of Plaintiff and assume it was.  There is one

Plaintiff also offers specific evidence of two past incidences when Officer Harris engaged in improper sexual conduct.  The first incident, included in the computer print out, occurred on May 25, 2000, when Officer Harris instructed a woman to take off her shirt and underwear and to bend over and spread her buttocks.  (Pl. Exs. 7, 8, 9).  This incident was investigated, (Pl. Exs. 6, 7), and Officer Harris was suspended for twenty days.  (Pl. Ex. 4).  After his suspension ended, three of Officer Harris's sergeants nicknamed him "Hot Dick Harris."  (Pl. Ex. 11).[16]  The next incident to which Plaintiff points is the alleged rape of Vera Bonner.  (Pl. Ex. 10).  In her brief, Plaintiff cites to a deposition in which Mrs. Bonner recounts her allegations, (Pl. Ex. 11), but offers no evidence of when the deposition was taken, when the city received notice, or the ultimate disposition of that proceeding.  While the Court takes very seriously the possibility that Officer Harris engaged in such egregious conduct and was not fired, Plaintiff's evidence on this matter never rises above a mere allegation.  See Brooks, 813 F.2d at

---

complaint listed against Officer Brandon Jackson for sexual misconduct.  The record itself does not reveal whether the complaint was ever sustained, but Officer Jackson did resign.  (Pl. Ex. 4 at 1).  Finally, as discussed in the next paragraph, Officer Harris received a twenty day suspension.  (Pl. Ex. 4 at 15).

[16]  The evidence that Officer Harris's night shift supervisors gave him a suggestive nickname is probative only insofar as it shows that those supervisors were actually policymakers or that the name they used for him was known among other policymakers.  See Ft. Lauderdale, 923 F.2d at 1480.  Neither party has offered any evidence or argument on this issue.

1194.[17]

Eleventh Circuit precedent makes clear that to establish a custom the practice of the City must be "persistent" and "widespread." Church v. Huntsville, 30 F.3d 1332, 1344 (11th Cir. 1994).  Where the Eleventh Circuit has upheld § 1983 liability against municipalities the evidence of a custom of overlooking or acquiescing to unconstitutional conduct by city policymakers has been quite strong.  See e.g., Griffin, 261 F.3d at 1308 (held that "the City[,] . . . the City Commission, Mayor, and other . . . City officials knew of, ignored, and tolerated [sexual] harassment.").  For example, in St. Mary's,. there was evidence at trial that past instances of police brutality had at times been totally ignored, and when an officer was disciplined that the discipline was a mere verbal reprimand.  787 F.2d at 1498.  Also in St. Mary's there was testimony from city council members and the police chief indicating that they were aware of the past incidents, yet they seemed unconcerned and took little or no corrective action .  Id.  Finally, the plaintiff in St. Mary's also offered evidence that the city had no program designed

---

[17]  Plaintiff offers no evidence indicating when the City became aware of the alleged rape. Because the analysis under § 1983 is "fault-based," it is required that Plaintiff show that the City or its policymakers had knowledge of the complaint(s).  St. Mary's, 787 F.2d at 1499.  Thus, a complaint or series of prior complaints figures into the a custom or policy analysis *only* where the City or the official policymakers of the City were aware of the complaint.  See Church, 30 F.3d at 1332; Brooks, F.2d 813 at 1193.  Because Plaintiff fails to offer any evidence as to the City's notice, the alleged rape does not further factor into the Court's analysis.

to train its officers not to use excessive force.  Id.  The Eleventh Circuit concluded

that St. Mary's "continued failure . . . to prevent known constitutional violations,"

fits squarely within the definition of an actionable custom under § 1983.  Id. at

1499.

      Plaintiff's evidence, unlike the evidence presented in St. Mary's, cannot

establish a custom.  Six substantiated complaints against officers in a large

metropolitan police force over a period of nearly eight years can hardly be called

"persistent" or "widespread."  Moreover, Plaintiff's own evidence establishes that

each sustained complaint against an officer for sexual misconduct  was punished.

(Pl. Ex. 4).  The Defendant offers the affidavit of Chief Nunn, who verifies that for

every complaint there is an investigation, and if sustained, a punishment.  (Def.

Ex. 13-15).  Moreover, as regards the first allegation of misconduct by Officer

Harris in 2001, there was a thorough investigation which resulted in a twenty day

suspension.  (Pl. Exs. 6, 7, 8, 9).  All of this evidence taken together completely

undermines the idea that the City had a custom of overlooking such complaints or

failing to deal with them.  In the instant case, Plaintiff's evidence does not

establish a custom or practice.  Nor does Plaintiff offer significant evidence that a

city policymaker condoned sexual misconduct, or even failed to properly

discourage it by turning a blind eye.  In sum, with regard to the claims stated

16

against the City in Counts IV and V, based upon the evidence presented to this

Court, there exists no genuine issue of any material fact, and the City is entitled to

judgment in its favor as a matter of law.[18]

## II.    *Failure to Train or Supervise*

Absent an actual policy giving rise to a Constitutional violation, "there are

limited circumstances in which an allegation of a 'failure to train' can be the basis

for liability under § 1983." <u>City of Canton</u>, 489 U.S. at 387; <u>City of Oklahoma v.

Tuttle</u>, 471 U.S. 808, 820 (1985).[19]   The Supreme Court has concluded that "the

inadequacy of police training may serve as the basis for § 1983 liability only

where the failure to train amounts to deliberate indifference to the rights of,"

citizens.   <u>City of Canton</u>, 489 U.S. at 388; <u>see</u> <u>also</u> <u>Brooks</u>, 813 F.2d at 1193

("failure to correct the constitutionally offensive actions . . . may rise to the level

of a 'custom or policy' if the municipality tacitly authorizes these actions or

displays deliberate indifference towards the police misconduct.").   When

evaluating claims of failure to train, "the focus must be on the adequacy of the

---

[18]   The Court also notes a total lack of evidence even "suggesting" the presence of the requisite link to any arguable policy or custom.  <u>See</u> <u>Brown</u>, 520 U.S. at 404.

[19]   The Supreme Court has recognized that in such cases great difficulty arises where there is no evidence that the inadequate "policy" "resulted from a conscious choice."  <u>Tuttle</u>, 471 U.S. at 822.  Allowing liability from such policies which are on their face constitutional and "further removed from the constitutional violation," raises the danger of completely undermining the limits set out in <u>Monell</u>.  <u>See</u> <u>id.</u> at 822-23.

training program in relation to the tasks the particular officers must preform."

City of Canton, 489 U.S. at 390-91. Merely because one particular officer received

inadequate training is insufficient to establish municipal liability. Id. at 391.

Likewise it is insufficient to only show "that an injury . . . could have been

avoided if an officer had better or more training, sufficient to equip him to avoid

the particular injury causing conduct." Id.  Deliberate indifference exists where a

municipality continues to utilize a particular training program or practice which

results in " a pattern of tortious conduct," of which municipal policymakers are or

should be aware of. Brown, 520 U.S. at 407-08.  As with all theories of liability

under § 1983, the alleged inadequate training must also be the "moving force,"

behind the complained of Constitutional violation. Vineyard v. County of Murray

Georgia, 990 F.2d 1207, 1213 (11th Cir. 1993).

     Plaintiff argues that the City's training program was obviously inadequate

and bases her conclusion primarily upon the evidence of Officer Harris's prior

misconduct.  Plaintiff offers no evidence as to what policy of training the City

followed or how it was deficient.  The City contends that it has an effective

training program that either meets or exceeds the applicable state and federal

recommendations.  (Def. Ex. 13-15).[20]  In addition, the evidence presented by both Plaintiff and the City makes clear that the City has a policy of investigating complaints, keeping a record of all complaints, and punishing officers against whom a complaint is confirmed.  (Pl. Exs. 1-9; Def. Ex. 13-15).

In <u>Ott v. City of Mobile</u>, Judge Butler in the Middle District of Alabama faced a set of circumstances similar to the instant case.  169 F. Supp. 2d 1301, 1310 (S.D. Ala. 2001).  The plaintiffs in <u>Ott</u> brought claims of failure to train against the municipality after an off duty police officer assaulted one plaintiff and shot another.  <u>Id.</u> at 1306.  In support of the failure to train claims, the plaintiffs acknowledged that the police officer had been trained, but contended that this training was insufficient as to that officer.  <u>Id.</u> at 1310.  Judge Butler, citing to <u>City of Canton</u>, noted that one officer's poor training is not enough to uphold such a claim and reasoned that the focus of the inquiry must be on an actual program, and some particular deficiency therein.  <u>See id.</u>  Judge Butler acknowledged that the plaintiffs could possibly make a claim if they could show that the police force had

---

[20]  The Court acknowledges that the affidavit of Chief Nunn merely explains that the City has a sufficient training policy in general terms, and does not go into significant detail.  While such an allegation would not be sufficient, if the City bore the burden of proof at trial, because Plaintiff bears the burden of proving her case at trial, the City's affidavit is sufficient to discharge its burden at the summary judgment stage.  <u>See Fitzpatrick</u>, 2 F.3d at 1115-16.  The burden has shifted back to the Plaintiff at this point, and Plaintiff must come forth with evidence from which a reasonable jury could find in her favor.

a history of "actual violations that have occurred with sufficient frequency." Id. However, the Ott plaintiffs only offered evidence of four meritorious complaints within five years preceding the incident. Accordingly, Judge Butler held that the plaintiffs' evidence as a matter of law was insufficient to create a material issue of fact. Id. at 1311.

Here, Plaintiff's allegation that Officer Harris's past action alone made the need for training obvious, cannot sustain her claim. City of Canton, at 390-91 ("the officer's shortcomings may have resulted from factors other than a faulty training program."). Moreover, like the Ott case, because Plaintiff fails to actually identify a program followed by the city or a deficiency in its program, her claims fail.[21] Where there is evidence that a municipality actually has a faulty program in place, a failure to train claim may succeed; however, Plaintiff has offered no evidence of such a deficient program and her claim fails as a matter of law. See e.g., Vineyard, 990 F.2d at 1212-13 (evidence was sufficient to establish municipal liability where there was evidence that sheriff's office did not record or investigate complaints; allowed accused officers to follow up on complaints

---

[21] In fact, the Supreme Court's reasoning indicates that it would be almost impossible for a jury to resolve the issue of causation and conclude that the City's policy represented a conscious decision that was deliberately indifferent to the rights of its inhabitants, where the plaintiff has not clearly identified a policy and its flaw. See Bryan County, 520 U.S. at 407 ("[e]xistence of a '*program*' makes proof of fault and causation at least possible in an inadequate training case." (emphasis added)).

lodged against them; did not file a report for the incident in question; and had no policies or procedures manual.).

The Eleventh Circuit treats claims for failure to train or supervise similarly and requires application of the same legal standards.  See e.g., Sewell v. Town of Lake Hamilton, 117 F.3d 488 (11th Cir. 1997); Vineyard, 990 F.2d at 1212.  Thus, Plaintiff's claim for failure to supervise fails for the same reasons as does her failure to train claim.  Plaintiff offers no evidence of the City's actual policy of supervising its officers, no evidence of any particular deficiency within that program, and no evidence that the City's policy was the actual cause of Officer Harris's actions.  See City of Canton, 489 U.S. at 391.  Rather, Plaintiff merely contends that Officer Harris's prior conduct made it obvious that he required more supervision.  For the reasons discussed supra, in light of the evidence, Plaintiff cannot sustain a claim for failure to supervise or establish deliberate indifference on the part the City.  See id., at 390.[22]  In sum, with regard

---

[22] In addition to the reasons discussed in the text of the opinion, Plaintiff's claims of failure to train and failure to supervise also likely fail because Officer Harris's actions were so obviously incorrect, that they do not readily give rise to an inference of deliberate indifference on the part of a municipality.  In Sewell, the plaintiff a police officer conducted an unnecessary strip search of and molested the plaintiff. 117 F.3d at 489.  The district court refused to grant summary judgment for the defendant municipality on the plaintiff's claims of failure to train and supervise. Id. On appeal the Eleventh Circuit reversed, and reasoned that "[w]here the proper response . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise."  Id. at 490.  (quoting Walker v. City of New York, 974 F.2d 293, 299-300 (2nd Cir. 1992)).

to the claims stated against the City in Count VII, there exists no genuine issue of any material fact and the City is entitled to judgment in its favor as a matter of law.

### Conclusion

The City of Birmingham is the only remaining defendant in the only three claims set forth in the complaint (Counts IV, V and VII) over which the Court has original jurisdiction.  Those claims will be resolved in favor of the City by the final judgment to be entered today.[23]  All of Plaintiff's remaining state law claims under Counts I, II, III and VI of the complaint by separate order will be REMANDED to the Circuit Court of Jefferson County for further proceedings. See § 1367(c)(3).

**DONE** this the _____8th_____ day of July, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[23]  As noted earlier, in Counts IV and V Plaintiff also alleges violations of the Alabama Constitution, which claims are also embodied in Count VI.  However, to the extent that any state law claim under the Alabama Constitution set out in Counts IV and V is not redundant with Count VI, the Court's dismissal of Counts IV and V in no way affects the Plaintiff's claims under Alabama law.